[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs have filed the above-captioned cases as affordable housing land use appeals under § 8-30g of the General Statutes. The plaintiffs JPI Partners, LLC (JPI Partners), JPI Apartment Development, L.P. (JPI Apartment Development), and the Hudak Family Nominee Trust, through its trustee John F. Hudak (Hudak), have appealed decisions by the defendant, the Planning and Zoning Board for the City of Milford (the Board), denying six applications related to the construction of 248 CT Page 4934 apartment units that would include affordable housing. For the reasons stated below, the court dismisses the appeals.
In their briefs and oral argument, the parties address both jurisdictional and substantive issues. The Board opposes the plaintiffs' applications on several grounds. It maintains that JPI Partners is not aggrieved since it has no ownership interest in the property and that JPI Apartment Development has no standing to bring an appeal under the affordable housing appeals statute, because it did not join in the applications made to the Board. On the substantive merits, relying on § 8-30g (c) of the General Statutes, the Board asserts that the affordable housing statute does not apply to the present case because the applications proposed affordable housing that is not assisted housing for an industrial zone not permitting residential uses.[1]
The plaintiffs argue that the court should sustain their appeal because the reasons given by the board members in denying the six affordable housing applications do not meet the standards required in affordable housing appeals. Specifically, they maintain that there is not sufficient evidence in the record to support those reasons, that the Board did not establish that such reasons clearly outweighed the need for affordable housing in Milford, and that reasonable modifications to their proposal could protect any legitimate public interests embodied in those reasons. As to the Board's assertion that the affordable housing appeals process is not applicable here because the plaintiffs' applications would place affordable housing in an industrial zone not permitting residential uses, the plaintiffs respond that (a) the court should not consider this claim since it was not raised by the Board at the administrative level and (b) the exemption from affordable housing law provided in § 8-30g
(c)(2) does not apply here because Milford zoning regulations allow residential uses in the light industrial zone at issue here. As to the Board's jurisdictional claims, the plaintiffs assert that JPI Apartment Development, as a contract purchaser and JPI Partners, as the applicant, are both aggrieved by the Board's decision.
 I — PROCEDURAL HISTORY
On June 16, 1999, JPI Partners and Hudak filed six related zoning applications that together proposed to construct a 248-unit apartment complex on 22.6 acres on Woodmont Road (the property) in Milford. (Return of Record, Items 1d, 2e, 2j, 2q, 21, 3z at f[2].) The Board held a public hearing on the six applications over two days, September 21 and 28, 1999. (Return of Record, 4n and 4p. ) On November 3, 1999, the Board voted to deny the applications. (Return of Record, 4t.) Although individual board members stated their reasons for why they voted as they did, the Board did not collectively state the reasons for its actions. CT Page 4935 Thereafter, the Board published notice of its decisions on November 8, 1999, and the plaintiffs filed timely appeals on November 23, 1999. After submission of the record and the receipt of trial briefs, the court held a trial of this case on September 1, 2000, for the purpose of allowing the introduction of evidence as to aggrievement. Thereafter, the parties filed supplemental returns to the record on January 31, 2001.
 II — FACTS
The six zoning applications filed on June 16, 1999, consisted of the following:
 1. A petition filed by JPI Partners and Hudak to amend the zoning regulations to crate a new zoning district entitled "Open Space Affordable Housing development — Multi-Family (OSAHD-MF)" (Return of Record, 1d);
 2. A petition brought in the name of JPI Partners and Hudak to change the zone of approximately 17 acres of the property from R-18 residential usage to the proposed OSAHD-MF zone. The completed petition for change of zone contained the name and signature of John J. Englert in the designated place for applicant's signature, the mailing address for JPI Partners in the space for applicant's mailing address, and Hudak's signature in the space designated for property's owner's signature. (Return of Record, 2e.)
 3. A petition brought in the name of JPI Partners and Hudak to change the zone of the remainder of the property from its current designation as a light industrial zone, LI-30, to the proposed OSAHD-MF zone. The completed petition for change of zone contained the name and signature of John J. Englert in the designated place for applicant's signature, the mailing address for JPI Partners in the space for applicant's mailing address, and Hudak's signature in the space designated for the property owner's signature. (Return of Record, 3z, (f).)
 4. A petition brought in the name of JPI Partners and Hudak for a special permit to allow the construction of 248 multi-family dwelling units with a model unit, rental office, and pool/clubhouse on CT Page 4936 the property pursuant to the proposed OSAHD-MF zone. The petition identified JPI Partners as the applicant. John J. Englert signed the petition in the designated place for applicant's signature. The petition listed Hudak in the space for "property owner's name" and Hudak signed it in the place assigned for the "property owner's signature." (Return of Record, 2j.)
 5. An application brought in the name of JPI Partners and Hudak for site plan review and approval of the site. The application identified JPI Partners as the applicant. John J. Englert signed the application in the designated place for applicant's signature. The application listed Hudak in the space for "property owner's name" and Hudak signed it in the place assigned for the "property owner's signature." (Return of Record, 2q.)
 6. An application for coastal site plan approval of the project. The application identified JPI Partners and Hudak as the applicants and Hudak as owner of the property. (Return of Record, 21.)[3]
Detailed architectural drawings submitted as part of the applications identified Hudak as the owner of the property and JPI Partners as the project "developer." (Return of Record, 4n.)
At the public hearing, counsel for the plaintiffs referred to JPI Partners as a "developer of high end, luxury end multi family community developments." (Return of Record, 4n at 45.) Jack Englert spoke and identified himself as "managing partner for JPI." (Id., 46.) Englert displayed a "power point presentation" regarding JPI Lifestyle Apartment Communities, L.P. (Return of Record, 41) during his remarks at the public hearing. During this presentation, he stated that
 JPI Lifestyle Apartment Communities . . . has been in business for about ten years. . . . JPI does a lot of things but the primary business is developing, building and managing luxury apartments. . . . [W]e started in 1990 with about 50 million dollars worth of development over the last ten [years] we've increased it to where in 1998 we did over 900 million and we came from just 20 employees in 1990 and we're up to over I think 1200 or just shy of 1200 now. . . . In 1998 we're close CT Page 4937 to two billion dollars worth of assets. . . . We are located across the country and building in I think 14 or 15 states at present. My office is . . . Massachusetts. We also have a regional office in Vienna, Virginia which handles the northeast. Urn, California, San Diego, and . ., satellite offices in both Portland, Seattle, and San Francisco. In terms of our national standing as a developer, in 19, we're the largest luxury multi family developer in the country from 1995 to 1998. Second largest apartment developer in the country. . . . Presently we have 13,000 units under construction or in various stages of 2development, nationwide. And we're one of the ten largest owners of multi family product in the country.
(Return of Record, 4n, 48-49.)
At the aggrievement hearing on September 1, 2000, John F. Hudak, trustee of the Hudak Trust, testified that the Trust had entered into a real estate purchase contract, introduced into evidence as plaintiffs' exhibit seven, to sell the property to JPI Apartment Development, L.P., conditioned upon issuance of all governmental permits necessary for construction of the proposed housing complex. John J. Englert testified that he is vice-president and managing partner for the northeast region for JPI. The plaintiffs also introduced documentary evidence establishing that:
 on August 31, 1999, JPI Partners, Inc., a Texas Corporation, converted to JPI Partners, LLC, a Texas limited liability company (Pls.' Ex. 7); and
 JPI Partners acted as the authorized agent of JPI Apartment Development, and JPI Apartment Development ratified and confirmed all actions taken in connection with the affordable housing application by JPI Partners. (Pls.' Ex. 9, "Confirmation of Authorization Agreement.")
 III — AGGRIEVEMENT AND STANDING A. Standard of Review
As with any administrative appeal, the court must first consider the questions of aggrievement and its analytical partner, standing. Under General Statutes § 8-30g (b)(2)(f), "[a]ny person whose affordable CT Page 4938 housing application is denied . . . may appeal such decision pursuant to the procedures of this section." Thus, "under § 8-30g (b), only an affordable housing applicant may initiate an appeal from a decision of a commission." Ensign-Bickford Realty Corp. v. Zoning Commission,245 Conn. 257, 267, 715 A.2d 701 (1998). Although not defining the term "applicant," the statute does define "affordable housing application" as "any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing." § 8-30g (a)(2).
The requirement that appeals under § 8-30g be made by an affordable housing applicant, however, is not the sole jurisdictional prerequisite for such appeals. The last sentence of § 8-30g (b)(1)(f) provides that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28 . . . or 8-30a, as applicable." This court concurs with the many decisions of the Superior Court construing this language as importing the requirement of aggrievement under those statutes into affordable housing appeals.[4] Aggrievement has a two-fold test: First, the party claiming aggrievement must demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by all members of the community. Second, the party claiming aggrievement must establish the agency decision has specially and injuriously affected that personal and legal interest Walls v. Planning Zoning Commission,176 Conn. 475, 477-78, 408 A.2d 252 (1979).
Under the affordable housing appeal statute, then, an appealing party must meet the twin requirements of being an applicant, a requirement that the court will refer to here as "standing," and of pleading and proving aggrievement. The plaintiffs here present three separate factual postures: Hudak, a property owner who joined in submitting the six zoning applications that comprised the affordable housing proposal; JPI Partners, a developer and applicant who proposed to build the affordable housing; and JPI Apartment Development, which held an option to purchase the subject property, is corporately related to the proposed developer, and for which that developer acted as agent in submitting the various applications. The court will examine each of the plaintiffs in turn.
B. Hudak
Although named on the various petitions that comprised the affordable housing application here, nothing in the record indicates that Hudak intends to develop affordable housing. Being an "applicant" or "petitioner" for a particular zoning request is not the same thing as being an affordable housing applicant, which is, by statutory CT Page 4939 definition, someone who proposes to develop affordable housing. The entire set of affordable housing applications and the evidence at the public hearing all described the plans of JPI for the property and its history of success elsewhere. Nothing in the record establishes that Hudak proposed to build affordable housing, or that anyone involved in the process regarded Hudak as doing so. The Board identified JPI as the developer in its minutes of the two-day public hearing,[5] minutes of two committee meetings discussing the proposals on October 26, 1999,[6]
and minutes of the regular meeting on November 3, 1999, when the Board voted to deny the applications. (Return of Record, 4s at 3, 4.) The plans and drawings identify JPI as the developer. (Return of Record, 4u.) The evidence at trial negated any legal interest in JPI by the Hudak. Hudak's only relationship with JPI was that of contract vendor. Thus, Hudak, although aggrieved, is not an applicant who proposes to develop affordable housing and lacks standing to bring an appeal under § 8-30g. See D'Amato v. Orange Planning and Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 516355 (December 13, 1993, Mottolese, J.) (10 Conn.L.Rptr. 444) (property owners who had signed various affordable housing applications, although classically aggrieved since they had "specific, personal and legal interest [which had] been specifically and injuriously affected by the [commission's] decision," held not to have standing because the applicant, not the owner, proposed to develop the affordable housing.)
Although the Board did not raise the question of Hudak's status on the appeal, the court, having concluded that it lacks jurisdiction, must on its own address the jurisdictional question. Accordingly, the court dismisses Hudak's appeals for lack of subject matter jurisdiction.
C. JPI Partners
JPI Partners was a named applicant on all six applications. The court finds, from the evidence offered at the aggrievement hearing, statements at the public hearing, and exhibits in the record, that JPI Partners will be the developer of the proposed housing complex. Thus JPI Partners, as an applicant to build affordable housing, meets the requirement of standing.
The question of whether JPI Partners is aggrieved is more complex. The courts have recognized that certain nonowners of land may be aggrieved for purposes of zoning appeals.[7] "[T]he extent to which a party with an interest in the property other than that of an owner is aggrieved depends upon the circumstances of each case, because the concept of standing is a practical and functional one designed to ensure that only those parties with a substantial and legitimate interest can appeal an order." Primerica v. Planning Zoning Commission, 211 Conn. 85, 93, CT Page 4940558 A.2d 646 (1989). To show that a nonowner is aggrieved, the court must examine a variety of factors specific to the facts of each case, such as "[w]hether the applicant is in control of the property, whether he is in possession or has a present or future right to possession, whether the use applied for is consistent with the applicant's interest in the property, and the extent of the interest of other persons in the same property." R R Pool Home, Inc. v. Zoning Board of Appeals, 43 Conn. App. 563,572, 684 A.2d 1207 (1996). Moreover, as the Supreme Court has instructed:
 The decisions have not been based primarily on whether a particular applicant could properly be characterized as an optionee or a lessee, but, rather, on whether the applicant was in fact a real party in interest with respect to the subject property. Whether the applicant is in control of the property, whether he is in possession or has a present or future right to possession, whether the use applied for is consistent with the applicant's interest in the property, and the extent of the interest of other persons in the same property, are all relevant considerations in making that determination
Richards v. Planning Zoning Commission, 170 Conn. 318-19, 323,365 A.2d 1130 (1976).
At the public hearing and in their complaint, the plaintiffs presented the different IPI entities as virtually identical or indistinguishable.[8] While an assortment of corporate and company identities is not unusual, the question still posed here is whether the evidence and record establish that JPI Partners has a specific, personal and legal interest in the subject matter of the Board's decisions that was specially and injuriously affected by those decisions. There is no evidence that JPI Partners itself has any legal interest in the property. It was, however, the agent for another party, JPI Apartment Development, that does have such an interest. At the aggrievement hearing, the plaintiffs established that JPI Partners acted at all times in this matter as the authorized agent for JPI Apartment Development, and that the latter has ratified and endorsed the actions of the former. Thus the question becomes whether, applying the factors identified in Richards v. Planning ZoningCommission, such agency is a sufficiently real and specific interest to make JPI Partners a real party in interest with regard to the subject property. CT Page 4941
JPI Partners is not in control of the property, does not possess it, and has offered no evidence that it has a present or future right to possession. Its interest is as the developer of affordable housing that its principal, JPI Limited Partnership, will purchase. Although this question was not addressed there, the court notes that in Center Shops;East Granby v. Planning Zoning Commission, 253 Conn. 183, 757 A.2d 1052
(2000), the Supreme Court considered a writ of mandamus brought by both a land owner and its agent, which had filed the zoning application for a special permit and site plan approval on behalf of the owner. The use for which JPI Partners has applied is consistent with the prospective ownership interest of its principal. The interest of the principal is consistent with the usage that JPI Partners proposes. Our appellate courts have repeatedly instructed that:
 Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented.
(Internal quotation marks omitted.) DiBonaventura v. Zoning Board ofAppeals, 24 Conn. App. 369, 373-74, 588 A.2d 244, cert. denied,219 Conn. 903, 593 A.2d 129 (1991). Based on all the evidence offered here, this court finds that JPI Partners, as agent for JPI Limited Development, has a real interest in the outcome and is therefore aggrieved. As the applicant for the affordable housing, it also has standing.
D. JPI Limited Development
As contract vendee, with an option to purchase the property, JPI Limited Development is aggrieved by the Board's decisions. The only issue is whether JPI Limited Development has standing to file an appeal. Since it was not formally named on the six applications to the Board, the Board asserts that JPI Limited Development does not qualify as an applicant. The court has found, however, that JPI Limited Development acted through its agent and has ratified all actions taken by that agent. As an undisclosed principal, JPI Limited Development was bound by the actions taken by its agent. Moreover, the Board was bound by duty to the undisclosed principal. Had the Board, for example, entered into a contract with JPI Partners as agent, the Board would have been contractually obligated to JPI Limited Development as principal. See 2 CT Page 4942 Restatement (Second) Agency § 302, p. 33 (1958): "A person who makes a contract with an agent of an undisclosed principal, intended by the agent to be on account of his principal and within the power of such agent to bind his principal, is liable to the principal as if the principal himself had made the contract with him, unless he is excluded by the form or terms of the contract, unless his existence is fraudulently concealed or unless there is set-off or a similar defense against the agent."
Standing is not a rigid concept to be mechanically applied, but is elastic and flexible, meant to ensure litigation only by real parties in interest. "As a remedial statute, § 8-30g must be liberally construed in favor of those whom the legislature intended to benefit." (Internal quotation marks omitted.) Kaufman v. Zoning Commission, 232 Conn. 122,140, 653 A.2d 798 (1995). This court can conclude, as did the court inKaufman, that "the plaintiff in this case satisfies the definitions offered by both legislators: he is a `[developer] who propose[s] to build affordable housing;' 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10663-64, remarks of Representative William J. Cibes, Jr. . . . and his proposal is a specific project on a particular piece of land." Id., 139. Where this case differs from D.S Associates v. Planning and Zoning Commission,27 Conn. App. 508, 607 A.2d 455 (1992), is that when JPI Partners filed the six zoning applications, it did so as agent for its corporate companion, JPI Apartment Development; what the agent did, the principal, through its agent, did also. At the public hearing, Englert made clear that the two were together proposing to undertake the development. The court thus concludes that JPI Apartment Development is both aggrieved and was a party to the six applications filed and hence has standing to bring this appeal as well.
 IV — STANDARD OF REVIEW
The standard of review in an affordable housing appeal places the burden on the town to show that its denial of the affordable housing application was justified under criteria set forth in § 8-30g. Here, the Board relies exclusively on its claim that the plaintiffs are proposing to place affordable housing that is not assisted housing in an industrial zone that does not permit residential uses. Under the statute, the Board must show "based upon the evidence in the record compiled before such commission that . . . (2)(A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section." General Statutes § 8-30g (g) CT Page 4943
In Christian Activities Council, Cong. v. Town Council, 249 Conn. 566,735 A.2d 231 (1999), the Supreme Court held that a reviewing court can only consider reasons explicitly stated by the land use agency in denying the affordable housing application:
 [I]f a town denies an affordable housing land use application, it must state its reasons on the record, and that statement must take the form of a formal, official, collective statement of reasons for its actions. . . . By contrast, in a traditional zoning appeal, if a zoning agency has failed to give such reasons, the court is obligated to search the entire record to find a basis for the agency's decision.
(Citations omitted; internal alterations omitted; internal quotation marks omitted.) Id., 576. In so doing, the court relied on the purpose and express language of the statute:
 We reach this conclusion based on the text and the purpose of the statute. The text requires that the town establish that sufficient record evidence supports "the decision from which such appeal is taken and the reasons cited for such decision. . . ." Thus, textually the statute contemplates "reasons" that are "cited" by the town. This strongly suggests that such reasons be cited by the zoning agency at the time it took its formal vote on the application, rather than reasons that later might be culled from the record, which would include, as in a traditional zoning appeal, the record of the entire span of hearings that preceded the vote. Furthermore, the statute requires that the town establish that: its decision [was] necessary to protect substantial public interests in health, safety, or other matters which the [agency] may legally consider . ., those interests clearly outweigh the need for affordable housing . . . and those public interests cannot be protected by reasonable changes to the plan. . . . These requirements strongly suggest that the town be obligated, when it renders its decision, to identify those specific public interests that it seeks to protect by that decision, so that the court in reviewing that decision will have a clear basis on which to do so. Furthermore, the key purpose of CT Page 4944 § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state. . . . Requiring the town to state its reasons on the record when it denies an affordable housing land use application will further that purpose because it will help guard against possibly pretextual denials of such applications. We therefore read the statute, consistent with its text and purpose, to require the town to do so.
(Citations omitted; internal alterations omitted; internal quotation marks omitted.) Id., 577-78. The Board here gave no collective statement of reasons for its denial of the plaintiffs' application; consequently, but for the location of a portion of the affordable housing complex in an industrial zone not permitting residential uses, the court would have had no option but to sustain the appeals.
The court in Christian Activities Council did not address, however, the industrial zone exception. It based its opinion only on the text of subsection (1). Moreover, it explicitly and carefully limited its finding there to "scope of review under § 8-30g (c)(I)." Id., 582. In so doing, it implicitly recognized that in 1995, the legislature added the industrial zone exception as subsection (2). Read literally, the new portion of the amended statute does not require the collective statement of reasons mandated under subsection (1)[9]:
 Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that . . . (2)(A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section.
General Statutes § 8-30g (c). Nothing in the legislative history of the statute shows an express awareness or intent on the part of the legislature to make this change.
The reasons the Supreme Court required zoning commissions to state their reasons collectively in affordable housing cases therefore do not seem directly applicable to the industrial zone exception. The statutory language of the industrial zone exception in effect at the time of the CT Page 4945 applications or decisions here does not require a statement of reasons. In view of the objective nature of the test — would the affordable housing be placed in an industrial zone; does that zone permit residential uses; is the proposed development affordable housing — there appears no need to worry about pretextual reasons. Moreover, the legislature has explicitly identified a clear public interest, protecting industrial zones not permitting residential uses from affordable housing development that would drain their potential industrial development. Under subsection (c)(2), there is no litany of legislative-specified factors against which a reviewing court must balance the public interest recited collectively by the agency. Instead, a reviewing court already has an objective and "clear basis" against which to assess the evidence in the record. Finally, in assessing the industrial zone exception, the court need not "cull the record" for other reasons, but merely decide whether the express requirements of subsection (c)(2) apply.
Thus, this court concludes that the Supreme Court's holding inChristian Activities Council does not apply to the present case, as that decision did not expressly address the industrial zone exception and the reasons relied on by the court there do not appear applicable to industrial zone cases. The fact that the Board here did not expressly rely on the industrial zone exception does not preclude this court from reviewing the record to determine whether the applications here would locate affordable housing that is not assisted living in an industrial zone not permitting residential uses.
 V — ISSUES PRESENTED A. Does the industrial zone where plaintiffs propose to locate a portion of' the affordable housing development permit residential uses?
An affordable housing developer cannot avail itself of the appeals process provided in § 8-30g if it proposes to locate affordable housing in an area zoned for industrial use unless one of two exceptions applies:
the industrial zone permits residential uses; or
 the affordable housing development would be assisted housing, as defined elsewhere in the statute.
§ 8-30g (2). The plaintiffs conceded at oral argument that the affordable housing proposed by the plaintiffs here was not "assisted living." The court must thus decide whether the particular industrial zone in question here permits residential uses. CT Page 4946
The affordable housing applications proposed to locate approximately four acres of the development in a limited industrial zone designated LI-30. Section 3.14.5 of the Milford Zoning Regulations specifies the "Prohibited Uses" in such a zone, one of which is that "[n]o dwellings or dwelling units shall be permitted; except for accommodations for watchmen, caretakers or custodians in conjunction with a principal use on the same premises." (Milford Zoning Regs., Art. III, § 3.14.5.1.) The plaintiffs do not claim that allowing accommodations for watchmen, caretakers or custodians qualifies as permitting "residential uses." Instead, the plaintiffs base their claims here on the fact that under the Milford zoning regulations assisted living residential facilities are an expressly "permitted use" in limited industrial districts, subject to certain conditions set forth in the margin.[10] (Milford Zoning Regs., Art. III, § 3.14.1.11.) The definitions section of the Board's zoning regulations, § 11.2, provides that an "assisted living residential facility" constitutes: "[a] residential facility which provides assisted living services by a Connecticut licensed assisted living services agency in a managed residential community, as defined under regulations of the State of Connecticut Department of Public Health, including the provision of supportive services to assist those in need of assistance in the activities of daily living. Such facility will be limited to those persons 62 years of age or older." (Milford Zoning Regs., Art. XI, § 11.2.)
Whether an assisted living residential facility is a "residential use" for the purposes of § 8-30g (2)(A) is a question of first impression. There are no appellate cases in Connecticut addressing the question. This court has found only a very few cases from other jurisdictions considering this question, and they are of little use in revolving the question here. They are all fact-specific and depend on the nature of the specific facility, the relevant statutory or regulatory provisions,[11] and the law of the jurisdiction.[12] As the Milford zoning regulations refer to the state regulations of the Department of Public Health, the court must scrutinize those regulations to ascertain the nature of an assisted living residential facility in determining whether they constitute a residential use.
Section 19-13-D105 (a)(2) of the Regulations of Connecticut State Agencies defines "assisted living services" as meaning
 nursing services and assistance with activities of daily living provided to clients living within a managed residential community having supportive services that encourage clients primarily age fifty-five (55) or older to maintain a maximum level CT Page 4947 of independence. Routine household services may be provided as assisted living services by the assisted living services agency or by the managed residential community as defined in subsection (a) (13). These services provide an alternative for elderly persons who require some help or aid with activities of daily living as described in subsection (a)(4) or nursing services in order to remain in their private residential units within the managed residential community.
The regulations define a "managed residential community" as "a facility consisting of private residential units that provides a managed group living environment, including housing and services primarily for persons age fifty-five (55) or older." Regs. Conn. State Agencies § 19-13-D105
(a) (13). Private residential units mean "a living environment belonging to a tenant(s) that includes a full bathroom within the unit including a water closet, lavatory, tub or shower bathing unit." The facility need not provide individual stoves or kitchen facilities in each resident unit but must offer access to facilities and equipment for the preparation and storage of food." Regs. Conn. State Agencies § 19-13-D105 (a) (15). Under the regulations, a "tenant" means a person who either owns, rents under a lease agreement or otherwise contracts for the use of the home within a managed residential community in which that person resides." Regs. Conn. State Agencies § 19-13-D105 (a) (17). Tenants may not be required to share units.
The assisted living regulations provide that a managed residential community must provide certain "core services," to its tenants: three regular meals a day, laundry service; transportation for personal, social, and health purposes; housekeeping services; maintenance service for tenants' living units, including chore services for routine domestic tasks that the tenant is unable to perform; and social and recreational programs. Regs. Conn. State Agencies § 19-13-D105 (c)(3). They must also provide 24-hour security, an emergency call system in each living unit; on-site washers and dryers, and common use space sufficient for half the tenants at once. Regs. Conn. State Agencies § 19-13-D105 (c) (4). Each facility must employ an on-site service coordinator to ensure that tenants received the mandated services, assist tenants meet their personal needs, and provide liaison with the assisted living services agency. Regs. Conn. State Agencies § 19-13-D105 (c)(5).
The Milford zoning regulations require that the facility provide "assisted living services" through a licensed assisted living services agency. Under the state regulations, assisted living services mean nursing services "to clients whose conditions are chronic and stable" CT Page 4948 and, under the supervision of a licensed nurse,[13] "assistance with activities of daily living," such as personal care services (bathing, oral hygiene, feeding, dressing, toileting and grooming); assisting clients with exercises, ambulation, transfer activities and supervision of self-administered medication; and routine household services such as shopping, meal preparation, laundry and housecleaning. Regs. Conn. State Agencies §§ 19-13-D105 (a)(2) and (4).
Under the state regulations, the facility itself may obtain a license to provide assisted living services, or it may contract with a separate assisted living services agency. Regs. Conn. State Agencies §19-13-D105 (c)(1). State law does not require any license for a managed residential community. Before such a facility can provide assisted living services, however, it must
 notify the state department of public health, either in writing or by telephone "of its intention to provide or arrange to make available licensed assisted living services";
 submit certain information required under those regulations to the department;[14] and
 the agency providing assisted living services must be licensed as an assisted living services agency.
Id. Although assisted living services agencies do not need a certificate of need under General Statues § 19a-639a, the state regulations; Regs. Conn. State Agencies § 19-13-D105; require that they be licensed by the state department of public health in accordance with § 19a-491 of the General Statutes, which governs licensure of health care institutions and specifically defines such an agency as "an institution that provides, among other things, nursing services and assistance with activities of daily living to a population that is chronic and stable." General Statutes § 19a-490 (l). Assisted living services agencies must establish written criteria for admission to and discharge from assisted living services. §§ 19-13-D105 (8) and (9), Reg. Conn. St. Agencies.
The assisted living services agency must have an office at the site of the residential facility for conferences with clients, space for staff storage of equipment, supplies, and files. Under the state regulations, the managed residential community need not have on-site medical or nursing staff but the assisted living services agency must have a registered nurse on call twenty-four (24) hours a day. CT Page 4949
The Board argues that this court should apply the holding ofConnecticut Light and Power Co. v. Overlook Park Health Care, Inc.,25 Conn. App. 177, 593 A.2d 505 (1991), to the present case. In OverlookPark, the Appellate Court concluded that a nursing home was not a "residential dwelling" for the purposes of a statute (§ 16-262e
[c]), making an "owner, agent, lessor or manager of a residential dwelling" liable for the costs of utility service. The plaintiff utility company in that case sought to recover unpaid utility bills incurred by a nursing home operated by the defendant corporation on property owned by the individual defendants. The court held that "a building designed to provide food, shelter and total health care services to clients who pay a single fee for all of these services is not within the ambit of a residential dwelling for the purposes of 16-262e (c)." Id., 180.
In a similar vein, in Antonik v. Greenwich Planning and ZoningCommission, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 163185 (June 4, 1999, Tierney, J.) (24 Conn.L.Rptr. 650), the court applied the Overlook Park distinction between a commercial facility providing nursing care and residential use. The court in Antonik held that a zoning commission properly granted a permit for such a facility in a residential zone allowing nursing homes and homes for the aged but not multi-family residences. The argument by an abutting land owner appealing that decision was the virtual clone of that made by the plaintiffs here, but to the opposite effect. The plaintiff there argued that the proposed assisted living residential facility was "a managed residential community . . . consisting of private residential units . . . belonging to a tenant . . . and not a home of the aged. What the commission has allowed is a multiple residential facility in an area where single family residences are permitted on four acres or more." (Internal citations omitted.) Id. The assisted living facility proposed there was a one-story building on 4.4493 acres, consisting of 29 units of assisted living in a 19,508 gross square foot building, adjacent to 217 bed nursing home operated by the same developer. An internal driveway would connect the site to the nursing home. In analyzing the nature of that facility, the court considered Revenue Ruling 98-47, which defines "residential rental property" for purposes of IRS tax-exempt bond rules. Focusing on the nature and degree of services provided to tenants, rather than the label used for the facility, the Revenue Ruling states that
 the availability of continual or frequent medical, nursing, or psychiatric services in a facility for the residents of the facility will cause the facility to be other than residential rental property. Other non-housing services available in a facility for the residents of the facility generally will not cause the facility to be other than CT Page 4950 residential rental property.[15]
Noting that the assisted living facility proposed there was "immediately adjacent to the skilled nursing facility" and would not provide full kitchen facilities, the court in Antonik concluded that the facility "is the equivalent to Building Z."
The plaintiffs make several arguments why an assisted living residential facility should be considered a "residential use" for the purposes of the industrial zone exception in the affordable housing statute. First, they emphasize the use of the word "residential" in the terms "assisted living residential facility" and "managed residential
community." As the IRS ruling and the court in Antonik noted, however, it is the nature and characteristic of the living facility and the services it provides, not the labels used to describe it, that should determine whether it is residential in nature.
Secondly, the plaintiffs point to the fact that the Milford zoning regulations appear to treat the permitted use of an assistance living residential facility in the LI-30 zone as an exception to the prohibition against residential uses: the list of uses permitted in limited industrial districts in § 3.14.1.11 of the zoning regulations specifies assisted living residential facilities "notwithstanding" the prohibition against residential uses in § 3.14.5.1. Yet the issue the court faces here is not just one of local ordinance. Whether an assisted living residential facility, as defined in the state regulations, is a residential use for purposes of the affordable housing statute applies not just to the City of Milford, but throughout the state. An individual town's zoning characterization of such facilities applies only to that municipality and does not control the analysis of that question under state law.
Finally, the plaintiffs rely on the fact that the Milford zoning regulations allow by special permit another type of senior living complex, defined as "planned elderly communities for persons fifty-five years or older" in residential zones in Milford. Milford Zoning Regulations, Art. III, § 3.16. They point out that such planned elderly communities may provide assisted living services, which, as defined under the state regulations, would include nursing services. But the Milford zoning regulations also allow schools, cemeteries, golf courses, hospitals, and, by special exception, nursing homes in residential areas by special permit. Milford Zoning Regulations, Art. III, § 3.1.2 ("Special Uses" in one family residential districts.) No one would claim that these are residential uses. Nor does being permitted in a residential district render a particular usage "residential." CT Page 4951
The court therefore does not find the plaintiff's arguments persuasive. Instead, the distinction suggested by Overlook Park and applied in Antonik and the IRS Revenue Ruling seems the better analytical tool for determining whether an assisted living residential facility is a "residential use." As the court noted in Antonik and the Revenue Ruling illustrated, assisted living facilities are on a continuum of congregate living facilities for the elderly. These would range from senior apartment complexes, whose only distinction from other dwelling units would be the age of the residents, to continuing care facilities that provide a range of services from independent living to nursing care and nursing homes. The IRS Revenue Ruling itself noted this distinction in holding that only those facilities making available continual or frequent nursing or medical care are not residential in nature.
This court agrees that an appropriate dividing line between those living facilities that are deemed "residential" and those that are not would be the nature and frequency of medical and nursing services provided there. Although assisted living residential facilities need not have onsite medical or nursing staff they must make nursing care available to all residents, and have a nurse on 24-hour call. All the assisted living services are provided by a nurse or under a nurse's supervision. Although the regulations do not specify the frequency of nursing services provided, the only limitation is that their recipients be chronic and stable. Such a facility obviously offers daily nursing services for varying lengths of time to its clients. The assisted living agency that serves such a facility is defined under state law as an "institution" and is licensed like other health care institutions. This court therefore concludes that such facilities are not "residential uses" for purposes of the affordable housing statute. Although there is a paucity of relevant decisions from other jurisdictions, the court notes that its decision here is consistent with the decision in MassachusettsApt Asset Management, Inc. v. Board of Appeals of Melrose,50 Mass. App. 133, 141, 735 N.E.2d 872, review denied, 432 Mass. 1111,739 N.E.2d 701 (2000), where the court held that use of property as an "assisted living residence" was not permitted as of right in an urban resident district because of "the provision of medical care, with medical professionals staffing an on-site facility from which such care is provided." Id., 141. As a consequence, the court further concludes that the apartment complex proposed here would have located affordable housing in an industrial zone not permitting residential uses and hence is not subject to the benefits of the burden-shifting and weighing of statutory factors provided under the affordable housing land use appeals statute.
B. The Motion to Supplement
The court's conclusion that the plaintiffs appeal cannot invoke § CT Page 49528-30g. however, does not end the court's task. The plaintiffs have moved to supplement the record and ask the court to consider their appeals based on the newly-submitted evidence. The plaintiffs ask the court to review a site development plan that would locate the entire housing development within that portion of the property zoned R-18 residential. The plaintiffs correctly assert that the Board did not raise its claim that their proposal would locate affordable housing in an industrial zone not permitting residential uses at the administrative hearing level, but only for the first time on appeal. Hence, the plaintiffs claim, they were deprived of their statutory right under § 8-30g (d), when submitting a proposal for affordable housing, to submit a modification of their original request responding to concerns raised by the Board.[16] The plaintiffs claim to be prejudiced by the Board's failure to "raise this issue during the administrative proceeding [or] . . . include such as a basis for the Board's denial of the affordable site development" by "not being able to present [or] include such a revised site development proposal in the record" for this court to review. (Pls' motion to supplement record.) Not having rendered a collective statement of reasons for the denial, the Board provided no formal "objections" to which the plaintiffs might respond in such a proposed modification.
Yet the affordable housing statute in effect at that time did not require the Board to state the industrial zone exception as a basis for rejecting the appeal. While the Board did not give a collective statement of reasons, at least one of the objections mentioned by individual board members, the loss of tax base, is directly related to the reason the legislature added the industrial zone exception in 1995. A frequently stated reason in committee hearings[17] and on the legislative floor[18] that year for adopting the industrial zone exception was that affordable housing developments being located in industrial zones were depriving municipalities of needed tax base industrial zones. Some of the people speaking against the plaintiff's proposal at the public hearing stated as one their reasons for doing so was that the loss of light industrial space would affect the city's tax base and revenues.[19] The plaintiffs were fully aware of the zoning designations of the parcel on which they proposed to place their complex. Their attorney even argued to the Board at the public hearing that assisted living facilities permitted in the LI-30 zone were residential uses. They presented remarks from a certified general appraiser at the public hearing that the proposed zone change would not harm the City's revenue base (Return of Record, 4n at 79-89, remarks of Stanley Gniazdowski); : "the loss of the industrial land to the City of Milford is insignificant and it's not gonna have a major impact." Id., 85. Aware of the residential use issue as to the LI-30 zone, the plaintiffs elected not to propose a modification that placed all the proposed development in the R-18 zone. Having made that CT Page 4953 choice, they may not now avoid its consequence.
In view of all these factors, the court concludes not to exercise its discretion to supplement the record. It is the appropriate role for the local zoning board to consider such proposals in the first instance. The court therefore denies the motion to supplement the record. Nothing prevents the plaintiff from resubmitting their applications to the Board anew.
Thus, the court concludes that plaintiffs have not sustained any basis for their appeal, and the court accordingly dismisses all six appeals.
SO ORDERED.
BY THE COURT STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT